# Exhibit 2

**MEMORANDUM OF AGREEMENT
BETWEEN
THE DEPARTMENTS OF STATE AND DEFENSE
ON THE PROTECTION AND EVACUATION
OF U.S. CITIZENS AND NATIONALS
AND DESIGNATED OTHER PERSONS
FROM THREATENED AREAS OVERSEAS**

The parties to this memorandum of agreement wish to set out their agreement concerning their respective roles and responsibilities regarding the protection and evacuation of U.S. citizens and nationals and designated other persons from threatened areas overseas.

**A.     POLICY OBJECTIVES**

In the event of an emergency abroad affecting the safety of U.S. citizens, it is the policy of the United States Government "--to:

1.      Protect U.s. citizens and nationals and designated other persons, to include, when necessary and feasible, their evacuation to and welfare in relatively safe areas.

2.      Reduce to a minimum the number of U.S. citizens and nationals and designated other persons subject to the risk of death and/or seizure as hostages.

3.      Reduce to a minimum the number of U.S. citizens and nationals and designated other persons in probable or actual combat areas so that combat effectiveness of U.S. and allied forces is not impaired.

**B.     INTERAGENCY CHECKLIST AND OTHER RELATED DOCUMENTS**

The documents attached hereto as appendices represent the parties' agreement on the respective subjects of those documents .

1. Checklist for increased interagency coordination in crisis/evacuation situations

2. Department of State/Department of Defense Cost Responsibilities matrix, with attached definitions

3. Policy guidance regarding evacuation of third-country and host.-country nationals. The establishment of this policy guidance shall not preclude coordination or cooperation with third countries in appropriate circumstances

4. Departments of State and Defense Liaison for Coordination and Implementation of Plans for the Protection of U.S. Citizens Abroad in Emergencies (Terms of Reference of the Washington Liaison Group)

5. Departments of State and Defense Liaison Coordination and Implementation of Plans for the protection of U.S. Citizens Abroad in Emergencies (Terms of Reference of the Regional-Liaison Groups)

C. **RESPONSIBILITIES**

1. <u>The Secretary of State and the Secretary of Defense</u> will continually monitor political, military, economic, and other conditions abroad as they relate to:

    a.   The imminence of general or local hostilities or civil disturbances which may endanger U.S. citizens and nationals and designated other persons.

    b.   The capability and willingness of local authorities to provide adequate protection for U.S. citizens and nationals and designated other persons.

    c.   The number and locations of U.S. citizens and nationals and designated other persons abroad.

    d.   Evacuation and protection capabilities, including transportation/lift requirements and their availability and the availability of relatively safe holding or survival areas for staging evacuees during emergencies.

2. The <u>Secretary of State</u> will exercise overall responsibility for attaining the objectives in Section A and, except as noted in Section C.3.b., shall:

    a.   Identify the offices within the Department of State having major evacuation planning and implementation responsibilities.

    b.   Prepare plans for the protection and evacuation of all U.S. citizens and nationals and designated other persons abroad, including Department of Defense (DOD) noncombatants. These plans shall provide for:

        (1)   In-place welfare and protection.

        (2)   Evacuation to the United States or to other safe haven areas and their welfare and protection in those areas in the event in-place protection is not feasible.

        (3)   Coordination to maximize timely use of available military transportation assets and existing host nation support infrastructure.

    c.   Coordinate with the Secretary of Defense so that plans for the evacuation from foreign countries of U.S. citizens and nationals and designated other persons, including Department Defense noncombatants, can be integrated into Department of State plans. This is to facilitate the military command's capability to clear expeditiously an area of probable conflict of as many personnel for whom the U.S. Government is responsible as feasible.

    d.   When appropriate, coordinate with foreign governments on aspects of evacuation planning and execution.

e.    Determine which parts of a plan are to be implemented, with the following exceptions.

(1)    When the situation is so serious that the issue be referred to the President.

(2)    When the Department of Defense has substantial interest , i.e., when the U.S. Government may be required to provide military assistance, or when military installations or a large number of DOD noncombatants are involved -- such determination, including the designation of safe havens, shall be -made after consulting the Secretary of Defense.

(3)    When, otherwise provided for in Section D.

f.  Implement the appropriate plan.

g.  Request the Secretary of Defense, when necessary, to make available military personnel and equipment to assist in an evacuation during crisis situations.  Appendix 2 defines evacuation and protection cost responsibilities to be borne respectively by the Department of State and the Department of Defense during an evacuation. Funding authorization and funding information for emergency situations should be Provided upon Department of Defense request.  This Memorandum of Agreement is not intended to define the limits of the President's constitutional and statutory authorities.

3.    <u>The Secretary of Defense </u>shall:

a.  Identify the offices within DOD having major evacuation planning and implementation responsibilities.

b.  Be primarily responsible for preparing, ordering the execution of and implementing plans for the protection and evacuation of all noncombatant U.S. citizens and nationals and certain designated other persons in the U.S. Naval Base at Guantanamo.

c.  In coordination with the Secretary of State, prepare and implement plans for the protection and evacuation of Department of Defense noncombatants worldwide; integrate such plans into Department of State plans for foreign countries; and assist the Secretary of State in carrying out responsibilities as stated in Section C.2., where militarily feasible.  In appropriate circumstances, such as a Presidential declaration of national emergency or- directed reinforcement of U.S. armed Forces in a theater, or to accommodate force protection or antiterrorism considerations, the Secretary of Defense, after consultation with the Secretary of State, may authorize the evacuation of all DOD noncombatants, except those attached to Defense Attaché Offices, Marine Security Guard Detachments, DOD elements or personnel that form an integral part of the U.S. Country Team, and others as determined between the Combatant Commander and the Chief of Mission, using commercial transport or retrograde military and sealift assets as appropriate, and by delaying personnel arrivals in a potential crisis area.

d.  Ensure prior authorization is obtained from the Department of State for any expenses incurred in the evacuation of non-DOD personnel and prepare proper documentation for reimbursement.  In situations when immediate DOD action is required to remove U.S. citizens from jeopardy, requests to the State Department for funding authorization may be submitted after expenses have been incurred by the Department of Defense.  Appendix 2 defines evacuation and protection cost responsibilities to be borne respectively by the Department of State and the Department of Defense during an evacuation.  For cases in which the Department of State incurs expenses for the DOD personnel the Secretary of Defense shall ensure that reimbursement of such costs is made.

4.     Chiefs of Diplomatic Missions and Principal Officers shall:

a.   Prepare and maintain the plans described in Sections C.2.c. for their areas of responsibility, and implement those plans when required.

b.   Provide timely information to the Secretary of State, the Secretary of Defense, the Chairman of the Joint Chiefs of Staff, and appropriate commanders of Combatant Commands and their subordinate commanders as necessary, regarding the number of potential evacuees, the availability of resources necessary to the evacuation plans, and recommendations as to which part(s) of the Department of State evacuation plans should be implemented.

5.     Commanders of Combatant Commands shall--

a.  In cooperation with appropriate Chiefs of Mission, prepare and maintain the plans in accordance with Sections C.3.b and C.3.c. for their areas of responsibility.

b.  Cooperate with Chiefs of Mission and Principal officers in carrying out their responsibilities under Section C.4.a.

c.  Upon approval by the Secretary, of State, conduct appropriate planning for evacuation support with foreign militaries.

d.  Upon request and when militarily feasible, assist in the evacuation or the in-place protection of those persons for whom the Secretary of State is responsible.

e.  Prepare and maintain military plans in support of evacuation operations and when directed, implement those plans.  Authority to implement plans independently is discussed in Section D.3.

## D.    AUTHORITY TO INVOKE AN EMERGENCY EVACUATION PLAN

1.     Normally, the Principal U.S. Diplomatic or Consular Representative shall request from the Department of State approval to invoke an emergency evacuation plan in an area where an emergency is expected or is developing.

a.      When hostilities or disturbances occur with complete surprise or appear imminent, the Principal U.S. Diplomatic or Consular Representative may invoke such elements of the plan as the situation warrants including requesting assistance of the appropriate military commander, while simultaneously informing the Department of State.

b.  The authority of the Principal U.S. Diplomatic or Consular representative to order an evacuation does not extend to those uniformed personnel of the U.S. Armed Forces and designated emergency-essential DOD civilians who are not under the authority of the U.S. Chief of Diplomatic Mission, or to U.S. citizens in the U.S. Naval Base, Guantanamo.

2.  Normally, the Combatant Commander in an area shall receive authorization from the Secretary of Defense through the Chairman, Joint Chiefs of Staff, before using any U.S. Armed Forces and facilities in a foreign country for protection and evacuation purposes.  However, when the U.S. military commander is requested by the principal U.S. Diplomatic or Consular Representative to assist in protecting or evacuating U.S. citizens and nationals and designated other persons, and any delay in obtaining authorization from the 'Secretary of Defense would jeopardize these persons, the U.S. military commander shall respond to the extent the commander deems militarily feasible.

3.  When U.S. citizens are endangered, but timely communications cannot be established between the principal U.S. Diplomatic or Consular Representative in the area and the appropriate Combatant Commander, and time and communications do not permit the commander to receive authorization from the Secretary of Defense without jeopardizing the U.S. citizens, the U.S. military commander may initiate action which he considers necessary, appropriate, and militarily feasible.  Non-military actions and use of civilian facilities and personnel initiated prior to military assumption of responsibilities will continue at the discretion of the military commander.

## E.      RESPONSIBILITY FOR MILITARY OPERATIONS

1.  In determining what military forces and equipment are necessary and appropriate, the Principal U.S. Diplomatic or Consular Representative, the Combatant Commander, and the appropriate U.S. military commander must consider whether there is the probability of international repercussions if U.S. Armed Forces are used in an area.

2.  Once the decision has been made to use military personnel and equipment to assist in the implementation of emergency evacuation plans, the military commander is solely responsible for conducting the operations.  However, except to the extent delays in communication would make it impossible to do so, the military commander shall conduct -.'lose operations in coordination with and under policies established by the Principal U.S. Diplomatic or Consular Representative.

## F.      ORGANIZATION FOR EMERGENCY EVACUATION PLANNING

Administration and coordination of the interagency responsibilities outlined above require the continuous exchange of information and views between the

Departments of State and Defense.  To facilitate these exchanges, the Washington Lia4son Group and regional liaison groups have been established as follows:

1.      The Washington Liaison Group (WLG) is an organization consisting of members of the Departments of State and Defense, chaired by a representative of the Department of State, which has basic responsibility for the coordination and implementation of plans for the protection and evacuation in emergencies of persons abroad for whom the Secretaries of State and/or Defense are responsible.  The representatives on the WLG are the points of contact for their departments on all matters pertaining to emergency evacuation planning, implementation of plans, and coordination of repatriation activities with the Department of Health and Human Services. (See Appendix 4).

2.  Regional liaison groups are established overseas and activated upon the recommendation of the WLG to assist in the coordination of emergency and evacuation planning between the Departments of State and Defense for areas outside the United States. (.See Appendix 5).

The procedures set forth in Appendix 1 shall be jointly exercised by the Departments of State and Defense as appropriate.

## G. ENTRY INTO FORCE; AMENDMENT

This memorandum of agreement supersedes the "Memorandum of Understanding between Departments of State and Defense on the Protection and evacuation of U.S. citizens and designated aliens abroad" of September 28-29, 1994.  This memorandum of agreement and its appendices, which latter shall be considered an integral part hereof, may be amended at any time by written agreement of the parties.  This memorandum of agreement shall enter into effect upon the date of last signature hereto and may be terminated by either party hereto on 30 days' written notice to the other party.

Thomas R. Pickering
Under Secretary
        for Political Affairs
Department of State

**Date: JUL 2 1998**

Walter B. Slocombe
Under Secretary of Defense
        for Policy
Department of Defense

**Date: 14 July 98**

**APPENDIX 1**

**CHECKLIST FOR INCREASED INTERAGENCY COORDINATION IN
CRISIS/EVACUATION SITUATIONS**

**Introduction**

Ensuring protection of United States nationals in foreign countries is a fundamental obligation of
the United States government.  When U.S. citizens are in danger and the host nation is unable or
unwilling to protect them, the USG must be prepared to protect and/or evacuate its citizens.

The Department of State (DOS) and the Department of Defense (DOD) have agreed upon the
following checklist for evacuations.

**Policy Guidelines**

The number of American citizens in a danger area should be reduced if a crisis is foreseen.  The
principal objective of reducing the number and /or evacuating U.S. citizens is to decrease the
number subject to physical harm and/or seizure as hostages.  A balance must be struck, however,
between the possible efficiency of early departure and the potentially destabilizing effect of such
a decision on the crisis.  The safety of U.S. citizens is of paramount concern, but successful
evacuation operations must take into account risks for evacuees and U.S. forces.

The USG will consider evacuating third country nationals (TCNs) and host country nationals
(HCNs) on a case-by-case and space available/ reimbursable basis when doing so serves U.S.
interests.  In doing so, the U.S. will coordinate with allies to share the burden of evacuations to
the extent possible, and will keep other nations informed of U.S. plans.

The funding responsibilities for evacuations are addressed separately in an agreement between
the Chief Financial Officer of the DOS and the Principal Deputy Comptroller of DOD.

**Strengthened Policy Mechanisms**

In order to strengthen coordination and ensure the earliest possible involvement of OSD, JCS,
and NSC in managing crisis/evacuation situations, two new interagency groups will be formed.

- **First,** a "Policy Oversight Group for Crisis/Evacuation Situations" (POG) will be
  established to provide broad direction and ensure consistent handling of crises in different
  parts of the world.  The POG will be chaired by the Under Secretary of State for Political
  Affairs and will include as core members appropriate senior officials from OSD, JCS, and
  NSC.  Other agencies will participate as required.

- **Second,** an interagency working group (IWG) will- be created to manage particular crises.
  This group will be chaired by the appropriate regional Assistant Secretary of State, with
  comparable representation from OSD, JCS and NSC.

- **Third,** the existing interagency Washington Liaison Group (WLG), chaired by a
  representative from State's Executive Secretariat, will continue to coordinate evacuation

planning, implementation and logistics on a working level. (This group's efforts will include the handling of evacuees after their departure from the area of crisis.)

1.      **Preparatory Steps**

-- Advance Planning - DOS and DOD will:

- ▪ Identify as early as possible potential "Hot Spots" that could require evacuations. DOS will estimate the number of private Americans and TCNs and HCNs who could potentially be offered evacuation assistance and will continue the present practice of sharing updated Emergency Action Plans (EAPS) and F-77 information with DOD and the responsible regional CINCS.

- ▪ Continue to issue Consular warning notices to private American citizens and reduce the number of official Americans and their family members as the crisis builds.  This information is presently and will continue to be made public so that third countries can minimize their own vulnerabilities.

- ▪ Prepare annually a personal message from the Under Secretary for Political Affairs to all Chiefs of Mission (COMs), emphasizing the critical importance of advance planning for any possible crisis.

-- Conduct appropriate travel by interagency teams to selected posts deemed to be most at risk of crisis.  Teams will assist posts in advance planning such as reviewing EAPs and F-77s, conducting security assessments, reviewing warden systems, and providing appropriate training.

-- The WLG will meet to discuss its role in interagency coordination of logistical aspects of drawdown/evacuations.

2. **First Signs Emerge of Potential Crisis**

**--**  Any member of the IWG convenes conference call or SVTS to discuss the developing situation.  Initial issues would include: review of tripwires, notifications to American citizens, status of drawdown/evacuation planning, availability of commercial transport, whether a CINC's Security Assessment Team should be deployed, other country assets, US military assets, potential for coordination of drawdown/evacuation planning with other governments, and possible TCN and host country national questions.

-- The IWG assesses next steps and makes recommendations to the POG.

-- Post and State Department consider options for limiting the number of official Americans at post even before authorized or ordered departure becomes necessary. Options include taking home leave, R&R or vacation early; delaying scheduled TDY; and, authorizing voluntary separate maintenance allowance (SMA) to enable eligible family members to leave post.

3

**3.      Situation Begins to Deteriorate**

-- Agencies formally convene working groups or task forces to manage drawdown/evacuation. Regular contact is maintained between DOS and DOD task forces.

    -- IWG establishes regular schedule of interagency SVTS or conference calls.  Important issues will be elevated to the POG and/or Deputies Committee as required.

    -- State working group or task force reviews tripwires with post; ensures that recommendations for authorized/ordered departure are made in timely fashion; and that every effort is made to take early advantage of commercial options for drawdown/evacuation.

    -- Consular notices to private Americans are reviewed and updated as necessary.

    -- National Command Authorities or CINC as appropriate make decision to pre-position forces to protect U.S. citizens.  Joint Staff will report CINC's intentions to IWG.  As a matter of general practice the Deputies Committee should consult when troops are pre-positioned for a potential NEO.

    -- Coordinate drawdown/evacuation informally with other countries.

**4.   Drawdown/Evacuation or NEO Becomes Necessary**

    -- Post or DOS Regional Assistant Secretary recommends, in consultations with management offices, drawdown/evacuation (including possible suspension of operations). Other agency members of the IWG are expected to contribute to the formulation of this recommendation.  IWG also discusses TCN and HCN evacuation policy.

    -- POG consults on drawdown/evacuation decision and TCN and HCN policy as necessary.

    -- If a drawdown/evacuation is under consideration, the POG discusses and then determines whether a Deputies Committee meeting would be helpful.

    -- Deputies should be informed through the Joint Staff when the regional CINC determines it is necessary to execute preparatory activities in order to support crisis monitoring, drawdown/evacuation and/or a NEO.  As a matter of general practice the Deputies will meet (in person, by SVTS, or by conference call) to seek interagency consensus before a NEC begins.  If the Deputies meeting does not reach consensus, the matter should quickly be brought before the Principals and, if necessary, the President.

    -- The President should be advised as appropriate by the Secretary of Defense when forces are pre-positioned to support a possible evacuation, before the execution of a NEO, and as necessary, thereafter.

-- The President will always be informed by the National Security Advisor when forces are pre-positioned for a NEO.

-- Under Secretary of State for Management makes formal drawdown/evacuation decision. If necessary, ExecSec/DOS forwards formal request to ExecSec/DOD for military-assisted evacuation (NEO).

-- The employment of forces to execute a military-assisted evacuation will be approved by the President, absent exigent circumstances requiring the CINC to act promptly to save lives.

-- Consular notice is issued to private American citizens.

-- WLG meets to coordinate 'Logistical details of the drawdown/evacuation.

-- IWG is briefed on the logistical details of the drawdown/evacuation.

-- Agencies coordinate press statements and any appropriate Congressional contacts.

**5.     Implementation of Drawdown/Evacuation or NEO**

**--** IWG and/or WLG continue to meet regularly.

**6.      Completion of Drawdown or NEO**

-- The IWG develops lessons learned, which are shared with other agencies and applied to management of future crises.

-- DOS/DOD financial staff coordinate and take necessary actions to collect costs, submit reimbursable documentation, bill evacuees, etc.

**7.  Follow-On Operations**

In situations where the decision has been made to reduce the number of personnel at an Embassy but not close it entirely, the regional DOS Assistant Secretary will raise in the IWG such issues as:

- Possible requirement for DOD assistance to sustain the Embassy in a confused or non-permissive environment.

- Guard force for Embassy and personnel.

- Maintenance of evacuation assistance forces on standby or alert.

MEMORANDUM OF AGREEMENT

Subject:          Department of State/Department of Defense Cost Responsibilities

    The matrix and definition attached reflect our agreement with respect to the standard allocation of Departmental responsibilities when an evacuation occurs.  It is, however, subject to resolution of outstanding legal issues by our respective General Counsels.

    By agreement, we leave separated the cost elements of an evacuation into two broad categories - evacuation and protection.  The Department of State would be responsible for the first category and the Department of Defense would be responsible for the second.

    The responsibilities as assigned within the matrix and definitions only apply with respect to evacuations.  Under other Department of State/Department of Defense agreements/activities, different responsibilities may exist.

**(Signed)   Aug 29 1997**                              **(Signed) September 2, 1997**
Alice C. Maroni                                         Richard L. Greene
Acting Under Secretary of Defense                      Chief Financial Officer
(Comptroller)                                          Department of State

Attachment:
    As stated

cc: National Security Council

# EVACUATIONS
## DOS/DOD Cost Responsibility Matrix and Definitions

Evacuation/
Protection
<u>Cost Responsibility</u>

Evacuation Related Costs 1/

| | | |
|---|---|---|
| A. | Evacuee Transportation Backhaul | DOS |
| B. | Landing Fees | DOS |
| C. | Positioning of evacuee transportation assets solely for Evacuation | DOS |

Protection Related Costs 2/

| | | | |
|---|---|---|---|
| D. | Positioning of transportation assets when assets are to be used for protection and evacuation | DOD | |
| E. | Special Pays (Imminent Danger, etc.) | DOD | |
| F. | Protection Forces (Including all support) | | DOD |
| G. | Deploy redeploy reconstitute protection element | DOD | |
| H. | Protection of evacuees/DOD assets & personnel | DOD | |
| I. | Tactical Airlift Control Element | DOD | |
| J. | Per Diem | DOD | |
| K. | Communications | DOD | |
| L. | NEO command structure | DOD | |

1/ If other evacuation efforts are specifically requested by Department of State, they will be billed under the Economy Act.

2/ If other protection efforts are performed during an evacuation, their cost will be borne by Department of Defense.

**Evacuations**

Definitions of Cost Elements in DOS/DOD Responsibility Cost Matrix

By agreement, DOS and DOD have separated the cost elements of an evacuation into two broad categories - Evacuation and Protection.  These definitions are intended to be applicable for al1 phases of an evacuation whether DOD assistance is required or not.  Protection responsibilities defined below apply only to evacuations and do not necessarily apply to other DOS/DOD agreements/activities.

**<u>Evacuation Related Costs</u>**

A.   <u>Evacuee Transportation Backhaul</u>

Incremental costs related to the movement of personnel (American citizens and other third country nationals) from identified point(s) of evacuation to designated turnover point(s).

For DOD, this represents costs incurred when an asset that is owned or leased by DOD is in use for the designated purpose of moving evacuees from the point of departure to the time until the evacuees am returned to the control of Department of State or some other designated entity.

Examples of such costs are: flying hours from designated departure zone(s) to designated safe haven(s) whether fixed or rotary wing aircraft (to include round trip return); steaming days (overseas movement) from designated port/area of operation to designated safehaven; over land conveyance of evacuees (trucks, buses, trains, etc.).  In cases where TRANSCOM assets/leasing are used, all costs incurred charged are incremental as this activity operates as a business fund and receives its nonsubsidy revenue through customers.  In cases where non-TRANSCOM assets am used incremental costs may be more difficult to identify.  For ship steaming costs, international costs will be assessed against evacuation criteria as the ship(s) are also likely involved in protection activities which will be borne by DOD.  For flying hours that originate from shipboard and return (when for evacuation purposes only), will be considered incremental as these tasks are mission related and a training environment does not exist nor is training being performed.

There are instances where U.S. forces may be transporting into the theater supplies, equipment, personnel, subsistence items, etc. which are necessary to support the protection portion of the evacuation.  Often, the transporting asset is returning empty/less than full to its place of origin having delivered its cargo.  When this occurs, that asset may also be able to evacuate personnel.  Because the cost of that asset returning to its place of origin is allocable to the protection portion of an evacuation, the incremental costs of transporting evacuees are usually negligible (this is commonly referred to as evacuation on a "space available" basis).  Generally, DOS will request this support on a reimbursable basis under the Economy Act.  This is commonly referred to as "reimbursable, no cost" due to the cost of the flight being covered for other primary purposes and there happens to be space available on that asset to evacuate personnel.

When available, use of protection intended assets for backhaul of evacuees is desirable as it has the dual benefit of maximizing the flow rate of evacuees onward towards the designated safe haven (utilizing a minimum of assets) and helps to keep overall costs of the evacuation mission to a minimum.

B.   Landing/Port Fees

Incremental costs incurred in the movement of evacuees from point of evacuation to the designated point of release to State or another assigned entity.

For DOD, this represents costs incurred in the movement of evacuees that art not reflected in reimbursable costs captured under "evacuee transportation.

Examples of such costs are: landing fees, tolls, air rights charges, seaport charges, etc. Fundamentally, these are costs that if not paid either prevent the efficient movement of evacuees or would result in less efficient and/or more costly means of moving evacuees towards the designated safe haven.

C.   Positioning of Evacuee Transportation Assets Solely for Evacuation

Incremental costs associated solely with the positioning of DOD owned/leased assets that are beyond requirements for protection and are needed specifically for evacuation support necessary to ensure the safe, efficient, and quick movement of evacuees.

For DOD, this represents the: costs of having to realign assets required to support an evacuation that must be brought from and returned to their homeport/base/area of operation to the point where these assets will conduct evacuation efforts whose costs fall under the definition of "evacuee transportation" above.

Examples of such costs are: relocation and return, by cargo lift or under their own conveyance, of evacuation assets to the designated station to fulfill the evacuation mission; relocation and return of cargo airlift to position evacuation assets (helicopters, trucks, etc.) - this also includes the cost to return cargo lift to home base or point of origination if cargo lift must return at a later date after the evacuation concludes in order to return "lifted" assets to their point of origin; relocation and return of Military Sealift Command/contract sealift assets to support evacuation (to include overseas shipment of assets).  Exceptions to the relocation and return policy are: aircraft/other assets diverted to an evacuation zone while en route to an alternate destination (splitting of such costs are deemed too subjective); and. backhaul of prepositioned assets (or lift used to preposition assets) to other than the point of origin/home base (this implies that the lift asset is now required for another mission and as such, the customer/parent Service should cover these transport costs.

**Protection Related Costs**

In some instances, the costs identified below can be influenced by evacuation-related requirements to a greater degree than protection-related requirements.  However, due to the difficulty and subjectivity in allocating such costs between evacuation and protection, DOD and DOS have agreed with a proposal to align these costs under "protection" which DOD will absorb.

D.  Positioning of Transportation Assets When Assets are to be used for Protection and Evacuation

Generally, assets brought into a theater are considered to be for the purpose of providing protection to U.S. forces and evacuees.  In these cases, this cost is borne by DOD.  In instances where it can be clearly demonstrated that an asset brought in to support an evacuation is beyond determined protection requirements and that asset's intended purpose is solely provided for evacuation efforts, then it may be considered under the definition in section C.

E.  Special Pays

When U.S. forces are deployed to a potentially hostile environment, they may be eligible for additional compensation such as imminent Danger/Hostile Fire pay and Family Separation Allowance.

Generally, these benefits are paid on a monthly basis whether the forces are utilized for one day or thirty days.  As some forces may be performing evacuation responsibilities one day (or shift, flight) mid protection requirements the next tracking, collecting, and reporting such data for reimbursement would be difficult to segregate and verify.

F.  Protection Forces (including all support)

Incremental costs related to the support of protection forces such as infrastructure requirements (base operations, utilities, messing requirements, housing requirements, etc.).

G.  Deploy/Redeploy/Reconstitute Protection Element]

Incremental costs related to the movement of protection forces and assets into and out of theater.  In addition this element covers the cost of restoring equipment and materiel to original condition prior to deployment.  This may involve depot maintenance/overhaul of equipment damaged during the evacuation and re-establishment of spare parts allowances necessary to support the operation of equipment and materiel.

H.  Protection of Evacuees/DOD Assets and Personnel

Incremental costs related to providing security for evacuees and DOD assets and forces. This may involve the establishment of safe areas while evacuees are waiting to be relocated to the designated turnover point, erecting perimeter fences/outposts, performing searches to relocate potential evacum3 to safe areas, etc.  Not included in this definition are incremental costs that may be incurred in providing security for the embassy when evacuation efforts have essentially been completed.

I. <u>Tactical Airlift Control Element (TALCE)</u>

In some evacuations, it is necessary for DOD to reestablish/take over/ provide for air traffic control of an existing airport or a temporary airfield that must be set up.  The TALCE is likely to support and benefit both the evacuation and protection elements of the operation.  Again. allocation of incremental costs would be a subjective exercise.  Although commercial aircraft may utilize an airport operated by a TALCE, the necessity to command the airport derives from protection concerns for U.S. citizens, property, forces.

J. <u>Per Diem/TDY</u>

Forces in theater, supporting the evacuation, may be eligible to receive per diem/TDY allowances.  As the majority of these costs would be incurred by forces on the ground involved in protection aspects of the evacuation and there is likely to be difficulty in splitting these costs if some forces were performing both evacuation and protection functions, these costs will be assigned to the protection category.

K. <u>Communications</u>

Incremental costs related to the use of communications to support the evacuation (satellite links. secure networks, portable communication devices, etc.). Communications costs will support both protection and evacuation functions of the operation.  Allocation of costs would be difficult and subjective.

L. <u>NEO/JTF Command Structure</u>

Incremental costs related to establishing (stand up/operation/shut down) the organizational elements within the geographic CINC to support the evacuation.  The command structure supports both evacuation and protection.  However, overriding concerns are related to protection and in some instances a command element may be established although DOD's participation in the evacuation may not be required.  Separating incremental costs related to evacuation would be an impossibility.

<u>Explanation of Footnotes on Cost Responsibility Matrix</u>

The first footnote is designed to allow for costs reimbursement for activities not covered under the above definitions, but are specifically requested by State and are necessary to support the evacuation.  The wording of the footnote is designed to limit the ability of DOD to include costs that go beyond the intent of a State request.

The second footnote is intended to recognize that there may be elements of protection that have not been outlined in the definitions provided.  Nonetheless, the footnote recognizes that the Department of Defense is responsible for bearing costs of protection that it incurs during an evacuation.

## APPENDIX 3
## EVACUATION OF THIRD COUNTRY NATIONALS

ISSUE: Many countries rely on the U.S. to evacuate their nationals during a crisis.  Current procedures have not resulted in effective planning for the evacuation of Third Country Nationals (TCN's) and Host Country Nationals (HCN's) or coordination with other countries who may be able to provide evacuation assistance.  This lack of coordination complicates evacuation planning, increases costs to the USG, and endangers successful evacuation of American citizens.

The following is a review of recent interagency discussions on improving advanced coordination for the emergency evacuation of TCN's and actions that will be taken as a result of those talks.

DISCUSSION

**What Is the current policy on TCN evacuation?**

Current policy on evacuation of third country nationals is outlined in the Department's Emergency Planning Handbook 12 FAH 1512(g).  Essentially this provision states that in the event of a Noncombatant Evacuation Operation (NEO), the USG will consider extending - on a humanitarian, space available but reimbursable basis - evacuation assistance to foreign nationals.

In practice, we have repeatedly assisted virtually all governments requesting assistance in evacuating their nationals from countries in which a NEO has become necessary.  Military planning has been hindered by grave underestimates of potential evacuees.

The Department refrains from entering into formal agreements with other governments on the evacuation of their nationals.  We have two long-standing agreements with the Canadians and British to consult with each other with respect to evacuation planning.  All foreign governments (including Canadians and British) are urged to plan for their own nationals' evacuation and not to depend on USG resources.

**How can we improve awareness of and implementation of current policy?**

The FAH is unclear on who may authorize evacuation of TCN's and does not define the criteria for deciding and prioritizing which countries should be offered evacuation assistance.  Crisis managers on the ground tend to err on the side of providing humanitarian evacuation assistance.  In an often chaotic crisis situation, many TCN's are evacuated with inadequate eligibility screening and little support from their own governments upon arrival in the safehaven.  While posts are best able to assess the advisability of assisting TCN's, the Department will provide appropriate guidance as soon as possible in a developing crisis.

<u>Action</u>

State will prepare more specific guidance for posts on evacuating TCN's under the current policy of providing such assistance on a space available, reimbursable basis.  If evacuation assistance is offered, foreign governments must be responsible for their evacuees at the points of departure and arrival in safehaven.  USG resources should be concentrated on assisting Americans, and we

should not risk jeopardizing our relationship with the safehaven government receiving the evacuees.

In addition, State will send a message to all Chiefs of Mission discussing crisis management, evacuation planning and TCN'S.  Outgoing ambassadors are briefed on evacuation planning as part of the Ambassadorial Seminar.  All posts will receive via cable a checklist for evacuation planning at post and the checklist for interagency evacuation coordination.

**Should. we negotiate bilateral agreements (MOU's) on TCN evacuations and/or multi-lateral agreements with organizations such as NATO or the WEU?**

In a crisis situation overseas, the primary concern of the USG is the protection of U.S. citizens.  Providing that protection requires maximum flexibility.  Entering into formal agreements with third countries could restrict the USG's ability to determine timing, duration, and location of a military assisted evacuation.  Such agreements could obligate - or be perceived as obligating - the U.S. to evacuate large numbers of TCN's and to continue operations after all Americans have been evacuated.  This would put U.S. military and civilians at greater risk and increase the need for DOD force protection.  In addition, the potential cost to the USG, State in particular, far exceeds our funding availability.

Presumably, formal evacuation agreements also would cover third country assistance to Americans in a crisis.  In some situations, third countries are better positioned to provide safe and timely evacuation assistance to Americans.  However, all agencies agree that the USG should not rely exclusively on other countries to protect our citizens.  While it is prudent to explore ways in which third countries can support U.S. efforts to get our nationals out of harm's way, we should not assume that assistance will be sufficient.

In isolated cases, e.g. planning for a Korea contingency, it may be advantageous for the U.S. to develop more detailed evacuation coordination plans through government-to-government or military-to-military contacts resulting in limited agreements.  However, in the majority of countries, the disadvantages of entering into formal evacuation agreements would outweigh the advantages.

**How can we Improve coordination on TCN evacuations and ensure that the burden is shared among all nations involved?**

The most effective means of increasing international cooperation and ensuring burdensharing is through coordination at post rather than formal agreements.  Ambassadors and regional CINC's should be the focal point for evacuation coordination in their countries of responsibility, as they have both country knowledge and contacts with other missions.  Chiefs of Mission and regional CINCs should work together and within the diplomatic community to explore avenues for evacuation coordination in their countries.

<u>Action</u>

Several tools for TCN coordination already exist.  The F-77 report includes information on TCN's who might request evacuation assistance.  The Emergency Action Plan (EAP) includes a section on coordination with other missions.  To provide more accurate estimates of evacuation needs, State will direct posts to compile more detailed information on numbers of TCN'S, assess

other missions' evacuation resources, and encourage those missions to establish their own evacuation plans.

Especially in 'hot spots,' posts should work closely with the diplomatic community to ensure adequate evacuation contingency planning, explore the capability of third countries to assist Americans in an evacuation and establish coordination and communication procedures that will facilitate international cooperation during an actual crisis.  State will encourage ambassadors to initiate early consultations on gaining other nations' support for evacuation operations, TCN management and identification of safe havens.  When appropriate, posts should urge other missions to encourage their nationals to depart a country in crisis.  In some cases, evacuation coordination with other missions may take place in Washington and in capitals as well as at post.

**APPENDIX 4**

**DEPARTMENTS OF STATE AND DEFENSE LIAISON FOR COORDINATION
AND
IMPLEMENTATION OF PLANS FOR THE PROTECTION OF
U.S. CITIZENS ABROAD IN EMERGENCIES**

**TERMS OF REFERENCE OF
THE WASHINGTON LIAISON GROUP**

**I. INTRODUCTION**

The Secretaries of State and Defense have established the Washington Liaison Group (WLG) to ensure coordination of the work of their departments in fulfilling their responsibilities for protection and evacuation of U.S. citizens abroad.

**II.  RESPONSIBILITIES**

The WLG is responsible for coordination and implementation at the national level of all emergency and evacuation plans by the Departments of State and Defense and by other U.S. Government agencies as appropriate.

**III.  FUNCTIONS**

To fulfill its responsibilities, the WLG shall:

**A.**   Recommend the establishment of such regional liaison groups as are advisable, along with their terms of reference, to the Secretary of State.

B.   Provide advice on evacuation planning and protection of U.S. citizens and nationals and designated other persons to regional liaison groups, U.S. diplomatic and consular costs, and military commands in countries.

C.   Monitor the activities of the regional liaison groups and provide direction as required through appropriate channels.

D.   Periodically review protection and evacuation capabilities relative to the number of U.S. citizens and nationals and designated other persons throughout the world for whose protection in-an-emergency the U.S. Government is responsible.

E.   Coordinate operations of the two departments incident to the evacuation and/or in-place protection of U.S. citizens and nationals and designated other persons abroad.  Upon activation of the Office of the Secretary of Defense Crisis Coordination Center and/or the Joint Chiefs of Staff crisis response elements within the National Military Command Center (NMCC) during an emergency or actual evacuation, the WLG's responsibilities for coordination of operations of the two Departments during crisis may be discharged through these elements together with the respective task force or working group within the State Department Operations Center.

**IV. MEMBERSHIP**

    A.   The WLG shall be chaired by a Department of State representative.  Membership shall include representatives of the Departments of State and Defense.

    S.   The WLG may invite representatives of such other departments and agencies of the U.S. Government (e.g., Department of Health and Human Services, Agency for International Development, etc.,) to participate in or attend as observers its meetings when appropriate and useful.

V.

Meetings shall be called by the WLG chairperson.

**APPENDIX 5**

**DEPARTMENT OF STATE AND DEFENSE LIAISON FOR COORDINATION AND IMPLEMENTATION OF PLANS FOR THE PROTECTION OF U.S. CITIZENS ABROAD IN EMERGENCIES**

<u>**TERMS OF REFERENCE OF
THE REGIONAL LIAISON GROUP**</u>

## 1. INTRODUCTION

The Secretaries of State and Defense have established regional liaison groups overseas as necessary to ensure coordination of emergency and evacuation planning-by their departments in the field.

## II.  AREAS OF RESPONSIBILITY

The regional liaison groups established overseas to fulfill the functions outlined in section III, are as follows:

A.       The <u>European Liaison Group (ELG):</u> Includes all of Europe, Russia west of 100 degrees East and the new states of the former Soviet Union; all countries of Africa west and south of Egypt, Sudan and Kenya; and Syria, Lebanon and Israel.

B.       The <u>Central Liaison Group (CLG):</u> Includes all of Africa and Southwest Asia not covered by the ELG, extending as far east as and including Pakistan.

C.       The <u>South American Liaison Group (SALG):</u> Includes Central America and South America.

D.       The <u>East Asia Liaison Group (EALG):</u> Includes all countries east of the Pakistan-India border, Australia and the island states of the Indian and Pacific Oceans and Vladivostok.

E.       The <u>Washington Liaison Group (WLG):</u> Has regional responsibility for Canada, the Caribbean Island states and Mexico and acts as the regional liaison group for all other areas not assigned, excluding the U.S. Naval Base, Guantanamo.

## III.  FUNCTIONS

Each regional liaison group overseas shall perform the following functions:

A.       Provide support to officials at diplomatic and consular posts and military commands in its area of responsibility by:

1.       Providing liaison between WLG and the posts.

2.       Ensuring coordination exists between the various posts, and between the posts and appropriate military commands.

3.      Assisting posts and the appropriate military commands in planning for the evacuation and/or in-place protection of U.S. citizens and nationals and designated other persons in an emergency.

4.      Reviewing the emergency evacuation plans prepared by posts and forwarding them to the Department of State for approval and distribution to ensure:

      a.      The information contained therein is adequate to meet the requirements of the Departments of State and Defense.

      b.      Post plans and U.S. and allied military operational plans do not conflict.

      c.      The plans of all posts in the area are coordinated when necessary.

B.      Refer to the WLG relevant issues which are not resolvable in the overseas area.

## IV.  MEMBERSHIP

A.      Each regional liaison group overseas shall be chaired by a Department of State representative.  Membership shall include representatives of the appropriate Combatant Commander and any subordinate component commands as desired.

B.      Regional liaison groups overseas may invite representatives of other U.S. departments and agencies to participate in their meetings when appropriate and useful.

## V.  CHAIN OF COMMAND

A.      The Chairperson of each regional liaison group overseas shall receive instruction from the Department of State.

B.      The military members of each group shall receive their instructions from the Secretary of Defense through the appropriate U.S. Combatant Commander.